FILED

DEC 2 3 2002

CLERK, U.S. DISTRICT COU
STERN DISTRICT OF CALIFO

DEPUTY C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

AMERICAN BANKERS ASSOCIATION,
a national trade association,
et al.,

                        NO. CIV. S-02-1138 FCD JFM

       Plaintiffs,

   v.                    MEMORANDUM AND ORDER

BILL LOCKYER, Attorney General
of the State of California, et
al.,

       Defendants.

----oo0oo----

    This action is before the court on plaintiffs American

Bankers Association, America's Community Bankers, Chase Manhattan

Bank USA, N.A., Citibank (South Dakota), N.A., Consumer Bankers

Association, Credit Union National Association, Inc., First USA

Bank, N.A., Household Bank (SB), N.A., Independent Community

Bankers of America, MBNA America Bank, N.A., and National

Association of Federal Credit Unions' (collectively,

"plaintiffs") (1) motion for a preliminary injunction, and (2)

197

1  motion for summary judgment and permanent injunctive relief.
2  Briefing has been submitted by the parties as well as *amicus*
3  *curiae* Office of the Comptroller of the Currency ("OCC") in
4  support of the motions, and *amicus curiae* Consumers Union,
5  Consumer Action, California Public Interest Research Group
6  (CalPIRG), Consumer Federation of America, National Consumer Law
7  Center, United States Public Interest Research Group, and AARP
8  ("Consumers Union") in opposition to the motions. Plaintiffs seek
9  a preliminary injunction restraining defendants Bill Lockyer,
10 Attorney General of the State of California, and Kathleen
11 Hamilton, Director of the California Department of Consumer
12 Affairs ("defendants" or the "State") from enforcing California
13 Civil Code section 1748.13 (the "statute" or "section 1748.13").
14 Plaintiffs further seek summary judgment and a permanent
15 injunction against defendants' enforcement of the statute on the
16 basis that section 1748.13 is preempted by federal banking laws
17 and thus inapplicable to all federally chartered credit card
18 issuers. The court heard oral argument on December 6, 2002, and
19 by this order now renders its decision.

20                          **FACTUAL BACKGROUND**

21 **1.    California Civil Code Section 1748.13**

22      In 2001, the California legislature passed Assembly Bill
23 Number 865. See Resp. of Defs. Bill Lockyer and Kathleen Hamilton
24 to Pltfs.' Statement of Undisputed Facts ("UF"), filed Oct. 25,
25 2002, UF 1. The Bill was codified as California Civil Code
26 section 1748.13. Id.  The Attorney General and Department of
27 Consumer Affairs have the power and duty to enforce section
28 1748.13. UF 2.

1       Section 1748.13 requires that certain language and
2   information be placed on the billing statements credit card
3   issuers provide their cardholders. The statute applies to all
4   credit cards,[1] but differentiates "retail credit cards" as a
5   separate category with slightly different requirements.[2] <u>See</u> Cal.
6   Civ. Code §§ 1748.13(a)(1)(A)(ii), 1748.13(b)(3).

7       According to defendants, the statute was designed to provide
8   credit card users with warnings about the length of time and
9   total amount of cost a cardholder will incur if (s)he repays the
10  outstanding balance on a credit card by remitting only the
11  minimum payment on each periodic bill. Section 1748.13 requires
12  credit card issuers to include the warnings contemplated by the
13  statute except in billing cycles where they either: (1) require a
14  minimum payment of at least 10% of the cardholder's outstanding
15  balance; or (2) do not impose finance charges. Cal. Civ. Code §
16  1748.13(c)(1)-(2); UF 4.

17      When credit card issuers do not meet these exceptions, they
18  must provide the warnings and information to cardholders
19  contemplated by the statute. First, each cardholder's bill must
20  display two messages on the front of the first page, in
21  capitalized type that is at least 8-point size. Cal. Civ. Code §
22  1748.13(a); UF 3. The first message is required and must state,

23
24      [1]    Credit cards are defined under section 1748.12 as
    "[a]ny card, plate, coupon book, or other single credit device
25  existing for the purpose of being used from time to time upon
    presentation to obtain money, property, labor or services on
26  credit."

27      [2]    Retail credit cards are those that are "[i]ssued by or
    on behalf of a retailer, or a private label credit card that is
28  limited to customers of a specific retailer." Cal. Civ. Code §
    1748.13(b)(3).

3

"Minimum Payment Warning: Making only the minimum payment will increase the interest you pay and the time it takes to repay your balance." Cal. Civ. Code § 1748.13(a)(1); UF 3. The statute also requires a second message, but allows the credit card issuer to decide between two optional methods of presenting further warnings and distributing information required by the statute. The credit card issuer must decide to provide one of the following options.

The first option is set out in section 1748.13(a)(2)(A). It provides that immediately after the Minimum Payment Warning, the credit card issuer must provide a short statement that describes the time it would take and the total cost to a cardholder if (s)he paid off balances of $1000, $2500, and $5000 by paying only the minimum payment, if the billing was based on an annual percentage rate of 17% and a minimum payment of 2% of the bill or $10 (whichever was greater). UF 3. Credit card issuers can satisfy the requirements of this option if they provide the same information for the three specified balance amounts at the annual percentage rate and required minimum payment which are applicable to an individual cardholder's account. Cal. Civ. Code § 1748.13(a)(2)(A)(i); UF 3.[3] If the credit card issuer chooses to provide this message then, immediately following the required wording, it must provide the following written statement: "For an estimate of the time it would take to repay your balance, making only minimum payments, and the total amount of those payments, call this toll-free number: (Insert toll-free telephone number)."

---

[3]     Similar requirements are imposed on retail credit card issuers. <u>See</u> Cal. Civ. Code § 1748.13(a)(2)(A)(ii).

4

Cal. Civ. Code § 1748.13(a)(3)(A); UF 3. The statute requires
that the toll-free number be available between the hours of 8
a.m. and 9 p.m. Pacific Standard Time, seven days a week. The
statute also mandates that the toll-free number provide consumers
with the opportunity to speak to a person, rather than a
recording, from whom the individualized account information
discussed above can be obtained. Cal. Civ. Code §
1748.13(a)(3)(B); UF 3.

The second option, under section 1748.13(a)(2)(B), allows a
creditor to print a written statement on the front of the bill's
first page that provides individual, "customized" information to
the cardholder. UF 3. This information would indicate an estimate
of the number of years and months and the approximate total cost
to pay off the entire balance due on an account if, based on the
terms of the credit agreement, the cardholder were to pay only
the minimum amount due for each bill. If the credit card issuer
chooses this option, the bill must also provide the cardholder
with either a referral to a credit counseling service or the
"800" number for the National Foundation for Credit Counseling
(through which the cardholder can be referred to credit
counseling services in, or closest to, the cardholder's county of
residence).[4] A credit card issuer is *required* to use this option
if the cardholder has not paid more than the minimum payment for
6 consecutive months after July 1, 2002. Cal. Civ. Code
§ 1748.13(a)(2)(B); UF 3; UF 8.

---

[4]   If the credit card issuer employs this option and the
account is based on a variable rate, the credit card company may
make disclosures based on the rate for the entire balance as of
the date of the disclosure and indicate that the rate may vary.

1     In addition to the requirements described above, the statute
2  mandates that the Department of Financial Institutions ("DFI")
3  establish a detailed table illustrating the approximate number of
4  months and approximate total cost to repay an outstanding balance
5  if the consumer pays only the required minimum monthly payments
6  and if no other fees are incurred. Cal. Civ. Code §
7  1748.13(a)(3)(C). These tables must consider: a significant
8  number of interest rates (§ 1748.13(a)(3)(C)(i)); a significant
9  number of different account balances (with the difference between
10 amounts considered no greater than $100) (§
11 1748.13(a)(3)(C)(ii)); a significant number of different payment
12 amounts (§ 1748.13(a)(3)(C)(iii)); and that only minimum monthly
13 payments are made with no additional charges or fees incurred on
14 the account. Cal. Civ. Code § 1748(a)(3)(C)(iv).

15    The information developed by the DFI can be referenced when
16 a cardholder calls the toll-free line and requests information on
17 how long and at what cost they would pay off a balance using a
18 minimum payment, or when the credit card issuer is required to
19 disclose this information to cardholders who have paid only the
20 minimum for 6 consecutive months. However, credit card issuers
21 are not allowed to include the full chart with a billing
22 statement to satisfy their obligations under the statute. Cal.
23 Civ. Code § 1748.13(a)(3)(D); UF 7.

24 **2.   Consumer Debt**

25    Defendants maintain that the statute should withstand
26 constitutional challenge because it benefits Californians by
27 requiring credit card issuers to provide information regarding
28 the costs and consequences of remitting only minimum monthly

credit card payments. Defs.' Mem. of P. & A. in Opp'n to Pltfs.' Appl. for a Prelim. Inj. and Mot. for Summ. J. ("Defs.' Opp'n to MSJ"), filed Oct. 25, 2002, at 2. Defendants represent that "U.S. and California households are facing an unprecedented debt crisis, brought about in large part by high levels of revolving credit card debt." Id. at 3.

A marked increase in purchases made with credit cards in the 1990s is in part responsible for the now-record levels of indebtedness across the United States. Id. Between 1990 and 2001, the total amount of revolving debt in United States households increased by 193%, from $190.9 to $559.6 billion. Id. at 3; Defs.' App. of Non-Federal Authorities and Other Cited Sources in Supp. of Defs.' Opp'n to Pltfs.' Appl. For Prelim. Inj. and Mot. for Summ. J. ("Defs.' App."), filed Oct. 25, 2002, at Exs. 24, 33. Defendants represent that in 2001, at least 55% of United States households (or approximately 41.7 million households total) holding a credit card revolved balances from month to month.[5] Californians accounted for approximately 4.5 million of these households, for a total sum of $61 billion in revolving debt owed by California's credit cardholders alone. Defs.' Opp'n to MSJ at 3-4.

The problem was further compounded in the 1990s when the growth of consumer debt exceeded the growth of personal disposable income. Id. at 4. For example, defendants represent

---

[5]     Defendants' citation for this statistic appears to be in error. In footnote 6 of their opposition brief, defendants cite to their appendix of authorities at Ex. 32, page 625. However, that exhibit only reflects statistics through the year 2000, and the particular table on page 625 only reflects statistics through 1998.

that between 1989 and 1998, the median annual income increased
34%, while the median debt increased 148% and credit card debt
increased 111%. See Defs.' App. at Exs. 38, 48, 49. In addition,
for the first time in history, total household debt surpassed
total household income in the United States in 2001. Defs.' Opp'n
to MSJ at 4.

Defendants maintain that low and middle-income households,
as well as college students, are "bearing the brunt" of this debt
crisis. Id. at 5. In support of their position, defendants point
to data indicating that low and middle-income households hold
higher credit card debt-to-income ratios than others. Id. at 5-6.
In addition, college students are increasingly graduating with
large amounts of credit card debt. Manning Decl., filed Oct. 29,
2002, at ¶ 29. Defendants posit that lower-income and college-
aged individuals are less likely to understand the consequences
of making only minimum monthly payments on their credit cards
while continuing to accrue additional charges. Id. at ¶¶ 34, 38,
39. Further, defendants note the major incentive of credit card
issuers to target low and middle-income households, due to the
fact that the issuers make the majority of their profits from
these populations. Id. at ¶ 9.

Finally, defendants cite a number of practical consequences
resulting from the debt crisis, including the following: a rising
number of delinquent accounts and personal bankruptcies;
resulting financial instability and increasing family pressures,
including health problems and divorce; bad credit resulting in
inability to finance purchases of homes and cars; and adverse
effects on the health of children, communities, and attendance at

8

1  work. See Defs.' Opp'n to MSJ at 8-10 and accompanying citations.
2  Thus, the State asserts that enactment of section 1748.13 will
3  benefit Californians by requiring credit card issuers to inform
4  consumers about the consequences of making minimum monthly credit
5  card payments. Id. at 10.

6  **3.    The Statute's Burdens**

7       Unsurprisingly, the parties disagree over the extent of
8  burdens imposed by the statute. Plaintiffs maintain that the
9  costs of compliance with the statute will amount to millions of
10 dollars in the aggregate in the first six months following
11 implementation alone.[6] Staten Decl. No. 4, filed Sept. 20, 2002,
12 at ¶ 5. Plaintiffs break down the cost estimates of compliance as
13 follows:

14      (A) Total "startup" costs already incurred: $3,352,797;

15      (B) Estimated one-time future startup costs:
16      $15,063,069;

17      (C) Average monthly total of estimated ongoing costs
18      for the six months following implementation of the
19      statute: $2,395,328.50; and

20      (D) Average monthly total of estimated ongoing costs
21      after the first six months following implementation of
22      the statute: $1,904,732, including $684,642.50 for
23      operation of the phone bank.

24

25      [6]   Prof. Staten bases his figures on data provided to him
26 for the following six large credit card issuers: Chase Manhattan
   Bank USA, N.A.; Citibank (South Dakota), N.A.; First USA Bank,
   N.A.; Household Bank (SB), N.A.; MBNA America Bank, N.A.; and
27 Fleet Bank (R.I.), N.A. Staten Decl. No. 4 at ¶ 3. Prof. Staten
   did not review the figures provided to him prior to conducting
28 his computations. Id.

9

Staten Decl. No. 4 at ¶ 5. The types of monetary costs defendants will accrue in complying with the statute's requirements include, for example, paper, postage, and printing costs, hardware and software development and maintenance costs, and costs associated with staffing and operation of the phone banks. See Mem. of P. & A. in Supp. of Pltfs.' Mot. for Summ. J. and Permanent Inj. Relief ("Pltfs.' MSJ"), filed Sept. 20, 2002, at 15-19.

Plaintiffs further maintain that the statute imposes significant non-monetary burdens on national banks. For example, some smaller federal institutions have stated their intention to exit the California credit card market entirely should the statute be implemented. See Hamby Decl., filed Sept. 20, 2002, at ¶ 7; Youngs Decl., filed Sept. 20, 2002, at ¶¶ 7-8. In addition, plaintiffs have introduced some evidence that the required Minimum Payment Warning is misleading to consumers. See Ward Decl., filed Sept. 20, 2002, at ¶ 9-11. Finally, plaintiffs submit that section 1748.13's requirements regarding counseling procedures interfere with national banks' business experience with the propriety and timing of such counseling measures. See Hill Decl., filed Sept. 20, 2002, at ¶ 9; Kietz Decl. No. 1, filed May 31, 2002, at ¶ 20; Weber Decl. No. 1, filed May 31, 2002, at ¶ 19.

In contrast, defendants maintain that costs associated with implementation of and compliance with the statute are not burdensome. For example, defendants assert that plaintiffs already have special operating procedures in place that would enable them to vary the format of monthly statements to provide certain information only to particular customers. See Decl.,

filed under seal pursuant to protective order Oct. 25, 2002, at Exs. 6, 8. Similarly, defendants allege that programs already exist which would allow plaintiffs to track payment patterns of customers without significant expense. Id. at Exs. 13-16. Further, defendants assert that plaintiffs already operate staffed phone banks similar to those required by the statute. Id. at Exs. 17, 19, 21, 22, 24. In addition, defendants assert that training expenses and start-up costs will not be significant. Id. at Ex. 4. Finally, defendants maintain that ongoing costs of compliance will amount to a very small percentage of plaintiffs' gross profits.

**PROCEDURAL BACKGROUND**

Plaintiffs filed this action on May 24, 2002, seeking to enjoin the commencement and enforcement of section 1748.13 on the following grounds: (1) under the Supremacy Clause, the statute is preempted by the National Bank Act of 1864 ("NBA"), 12 U.S.C. §§ 21 et seq., and the Federal Credit Union Act ("FCUA"), 12 U.S.C. §§ 1751 et seq.; (2) the statute violates the dormant commerce clause; and (3) the statute violates 42 U.S.C. § 1983 because it violates either the NBA, the FCUA or the Constitution. Compl., filed May 24, 2002, ¶¶ 3, 10.

Plaintiffs first sought a preliminary injunction against enforcement of section 1748.13 by their motion filed May 31, 2002. Mem. of P. & A. in Supp. of Pltfs.' Appl. for Prelim. Inj. ("Pltfs.' Appl. for PI"), filed May 31, 2002. The court heard oral argument on June 28, 2002 and issued an order finding the record at that time insufficient to render a decision as to the issuance of a preliminary injunction. Mem. & Order, filed June

11

28, 2002, at 11. Accordingly, the court continued the hearing on the motion and permitted the parties to conduct limited discovery until August 30, 2002, and to thereafter file supplemental briefs. The parties were further directed to answer certain questions in their supplemental briefs on matters of interest to the court. See Order, filed July 5, 2002. Enactment of the statute was enjoined pending the continued hearing on the motion. Mem. & Order, filed June 28, 2002, at 2.

Plaintiffs filed their supplemental brief along with their motion for summary judgment on September 20, 2002. Defendants opposed both motions in one brief filed October 25, 2002, and plaintiffs filed a reply brief on November 15, 2002. Plaintiffs base their motion for summary judgment on the grounds that section 1748.13 is wholly preempted by the NBA, the FCUA, the Home Owners' Loan Act ("HOLA"),[7] and the Supremacy Clause. Plaintiffs maintain that there is no genuine issue of material fact regarding the preemption analysis, and that therefore they are entitled to judgment as a matter of law, as well as a permanent injunction barring enforcement of the statute against all federally chartered credit card issuers.

## STANDARD[8]

The Federal Rules of Civil Procedure provide for summary

---

[7]     While defendants do not dispute the appropriateness of plaintiffs' HOLA preemption argument in their motion for summary judgment, the court notes that plaintiffs' complaint does not include a claim for relief based on preemption by HOLA. See Compl., filed May 24, 2002, ¶¶ 3, 10.

[8]     Because the court's decision on plaintiffs' motion for summary judgment moots plaintiffs' motion for a preliminary injunction, the court does not recite the applicable standard herein.

adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). If the moving party does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." <u>Celotex</u>, 477 U.S. at 325. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. <u>See</u> <u>T.W. Elec. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987) (citing <u>Matsushita Elec. Indus.</u>

13

1  Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). The

2  evidence presented by the parties must be admissible. Fed. R.

3  Civ. P. 56(e). Conclusory, speculative testimony in affidavits

4  and moving papers is insufficient to raise genuine issues of fact

5  and defeat summary judgment. See Falls Riverway Realty, Inc. v.

6  City of Niagara Falls, 754 F.2d 49, 57 (2d Cir. 1985); Thornhill

7  Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

8                              **ANALYSIS**

9  **1.   General Preemption Principles**

10      Federal preemption of state law may occur expressly, by

11  implication, or by actual conflict with federal law. Express

12  preemption occurs when Congress states in explicit terms its

13  intent to preempt state law. Jones v. Rath Packing Co., 430 U.S.

14  519, 525 (1977). Preemption by implication, or "field

15  preemption," occurs when federal regulation in a particular area

16  is "so pervasive as to make reasonable the inference that

17  Congress left no room for the States to supplement it." Rice v.

18  Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). Finally,

19  conflict preemption[9] exists when there is an actual conflict

20  between state and federal law. See Fidelity Federal Savings &

21  Loan Assoc. v. de la Cuesta, 458 U.S. 141, 153 (1982).

22      The Supreme Court has described the applicable inquiry in

23  assessing whether a conflict exists between state and federal law

24  in a numbers of manners. See Barnett Bank of Marion County v.

25  Nelson, 517 U.S. 25, 31 (1996). For example, actual conflict

26  arises when simultaneous compliance with state and federal law is

27

28      [9]   Conflict preemption is sometimes treated as a type of
implied preemption. See Geier, 529 U.S. at 884.

                                14

a "physical impossibility," or when state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" <u>Bank of America v. City & County of San Francisco</u>, 309 F.3d 551, 558 (9th Cir. 2002) (quoting <u>Florida Lime & Avocado Growers, Inc. v. Paul</u>, 373 U.S. 132, 142-43 (1963); <u>Hines v. Davidowitz</u>, 312 U.S. 52, 67 (1941)). In addition, in some instances, federal and state law can be in "irreconcilable conflict." <u>Rice v. Norman Williams Co.</u>, 458 U.S. 654, 659 (1982). Further, a state law is preempted when it "frustrates the purpose of [] national legislation, or impairs the efficiencies of [] agencies of the federal government to discharge the[ir] duties." <u>McClellan v. Chipman</u>, 164 U.S. 347, 357 (1896). Alternatively, "[s]tate regulation of banking is permissible when it 'does not prevent or significantly interfere with the national bank's exercise of its powers.'" <u>Bank of America</u>, 309 F.3d at 558-59 (quoting <u>Barnett Bank</u>, 517 U.S. at 33).

States are not without any authority to impose regulations upon national banks. They do "retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and tort law." <u>Bank of America</u>, 309 F.3d at 559 (citing cases). However, because there is a "'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable." <u>Id.</u> (citing <u>United States v. Locke</u>, 529 U.S. 89, 108 (2000)).

**2.   Truth in Lending Act**

Defendants argue that it was Congress's intent that the

federal Truth in Lending Act ("TILA"), rather than the NBA, HOLA, or FCUA determine whether states' credit card disclosure laws are preempted by federal law. See Notice of Errata and Mem. of P. & A. in Opp'n to Pltfs.' Appl. for Prelim. Inj. ("Defs.' Opp'n to PI"), filed June 19, 2002, at 11-12; Defs.' Opp'n to MSJ at 14. TILA was enacted to "protect the consumer against inaccurate and unfair credit billing and credit card practices," and to provide for the "meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). TILA grants the Board of Governors of the Federal Reserve System power to prescribe regulations and carry out the purposes of the Act. See 15 U.S.C. § 1604(a).

Defendants point out that TILA does not preempt state laws regarding credit transaction disclosures "except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency." 15 U.S.C. § 1610(a)(1). Defendants maintain that "[b]ecause TILA governs credit card disclosures in detail and applies to banks as creditors, Congress intended it to occupy the entire field of consumer disclosures." Defs.' Opp'n to PI at 13.

Defendants identify TILA's "savings clause" as evidence that state laws governing disclosures are not preempted unless they conflict with federal law. TILA's savings clause provides:

> Except as provided in subsection (e) of this section,[10] this part and parts B and C *of this subchapter* do not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent *with the provisions of this*

---

[10]   Subsection (e) refers to credit and charge card application and solicitation disclosure provisions, and has no bearing on the analysis here.

> *subchapter* and then only to the extent of the
> inconsistency.

15 U.S.C. § 1610(a)(1) (emphasis added). Thus, the express language of the savings clause indicates that its anti-preemptive effect is limited to TILA. The text provides no indication that the savings clause reaches beyond TILA to control the preemption analysis applicable under any other federal laws, including the federal banking laws.

The Ninth Circuit reached a similar conclusion in its recent opinion in <u>Bank of America</u>. In <u>Bank of America</u>, the court addressed the scope of the Electronic Fund Transfer Act's ("EFTA") savings clause, which bears a striking similarity to TILA's. 309 F.3d at 565. The EFTA's savings clause provides in part:

> *This subchapter* does not annul, alter, or affect the
> laws of any State relating to electronic fund
> transfers, except to the extent that those laws are
> inconsistent *with the provisions of this subchapter*,
> and then only to the extent of the inconsistency.

15 U.S.C. § 1693q (emphasis added). The Ninth Circuit stated that "the plain language of § 1693q indicates that it is limited to the EFTA. Section 1693q's reference to 'this subchapter' indicates that the EFTA's anti-preemption provision does not apply to other statutes." 309 F.3d at 565. The court further concluded that "[b]ecause the EFTA's anti-preemption provision is limited to the EFTA, it does not save the Ordinances against preemption by the HOLA and the National Bank Act." <u>Id.</u>

In light of the Ninth Circuit's findings in <u>Bank of America</u> regarding a substantially similar savings clause under the EFTA, the court finds that TILA's savings clause does not save section

17

1   1748.13 from preemption by other federal banking laws such as the
2   HOLA, NBA, and FCUA.

3   **3.    Home Owners' Loan Act**

4        The Home Owners' Loan Act of 1933 ("HOLA") "was enacted to
5   restore the public's confidence in savings and loan associations
6   at a time when 40% of home loans were in default." <u>Bank of</u>
7   <u>America</u>, 309 F.3d at 559. The enactment of HOLA was due in part
8   to Congress's dissatisfaction with the manner in which states
9   were conducting the regulation of home financing. <u>See</u> <u>Conference</u>
10  <u>of Fed. Sav. & Loan Ass'ns v. Stein</u>, 604 F.2d 1256, 1257 (9th
11  Cir. 1979), <u>aff'd</u>, 445 U.S. 921 (1980).

12       The Office of Thrift Supervision ("OTS") is charged with
13  responsibility for the administration and enforcement of HOLA. 12
14  C.F.R. § 500.1(a). Pursuant to HOLA, the OTS has the power,
15  "under such regulations as [it] may prescribe - [] to provide for
16  the organization, incorporation, examination, operation, and
17  regulation of . . . Federal savings associations . . . ." 12
18  U.S.C. § 1464(a). The OTS has broad discretion to promulgate
19  regulations that are "appropriate to carry out [its]
20  responsibilities." 12 U.S.C. § 1463(a)(2).

21       The Supreme Court has stated that "[f]ederal regulations
22  have no less pre-emptive effect than federal statutes." <u>See</u> <u>De la</u>
23  <u>Cuesta</u>, 458 U.S. at 153. In addition, the Court has specifically
24  noted that OTS regulations govern the "'powers and operations of
25  every federal savings and loan association from its cradle to its
26  corporate grave.'" <u>Id.</u> at 145 (quoting <u>People v. Coast Fed. Sav.</u>
27  <u>& Loan Ass'n</u>, 98 F. Supp. 311, 316 (S.D. Cal. 1951)). The Ninth
28  Circuit has further recognized that OTS regulation of federal

18

savings associations is "so pervasive as to leave no room for
state regulatory control." <u>Stein</u>, 604 F.2d at 1260; <u>Bank of
America</u>, 309 F.3d at 558.

The OTS regulations themselves expressly declare they are
"preemptive of any state law purporting to address the subject of
the operations of a Federal savings association." 12 C.F.R. §
545.2. The regulations further specify that the OTS governs the
lending-related practices of federal savings associations:

> OTS hereby occupies the entire field of lending
> regulation for federal savings associations. OTS
> intends to give federal savings associations maximum
> flexibility to exercise their lending powers in
> accordance with a uniform federal scheme of regulation.
> Accordingly, federal savings associations may extend
> credit as authorized under federal law, including this
> part, without regard to state laws purporting to
> regulate or otherwise affect their credit activities.

12 C.F.R. § 560.2(a).

Importantly, the regulations provide a list of "illustrative
examples" which set out "the types of state laws preempted by
paragraph (a) of this section." 12 C.F.R. § 560.2(b). Included in
the list of preempted state laws are those that govern the terms
of credit, such as adjustments to interest rates, balances, and
payments due. 12 C.F.R. § 560.2(b)(4). Additionally preempted are
those state laws that concern "[d]isclosure and advertising,
including laws requiring specific statements, information, or
other content to be included in . . . billing statements . . . or
other credit-related documents . . . ." 12 C.F.R. § 560.2(b)(9).

In <u>Bank of America</u>, the Ninth Circuit found that a conflict
existed where OTS regulations authorized federal savings
associations to use "electronic means or facilities to perform
any function, or provide any product or service" while certain

municipal ordinances prohibited financial institutions from
charging ATM fees to non-depositors. 309 F.3d at 556, 560-61. The
court noted that OTS regulations occupied the field of
operations, deposit, and lending practices of federal savings
banks. Id. at 560. The court further held that HOLA and OTS
regulations preempted conflicting state limitations on the
authority of federal savings associations to collect fees
relating to electronic services. Id. at 560-61.

Similarly, the OTS regulations at issue here conflict with
the requirements of section 1748.13. For example, section
1748.13(c)(1) requires that credit card issuers charge at least a
10% minimum payment of a cardholder's outstanding balance in
order to escape the statute's requirements. Cal. Civ. Code §
1748.13(c)(1). Although defendants argue that this provision does
not impose a "requirement" but rather provides an "option" for
those banking institutions that seek to avoid the requirements of
section 1748.13, the statute nevertheless functions to coerce
savings and loan associations to adopt the State's rules
regarding payment requirements in direct contravention of OTS
regulation 560.2(b)(4).

Further, section 1748.13's disclosure requirements conflict
with OTS regulation 560.2(b)(9). Under section 560.2(b)(9), state
laws regarding disclosure, including those requiring specific
statements or information in billing statements, are preempted.
12 C.F.R. § 560.2(b)(9). As described above, section 1748.13
requires that a number of specific disclosure statements be
included in a credit cardholder's billing statement. For example,
the Minimum Payment Warning clause must be included in all

billing statements. Cal. Civ. Code § 1748.13(a)(1). In addition,
every statement must also include some type of disclosure
identifying the ultimate cost and length of time it would take to
pay off a balance by remitting only the minimum payment each
billing period. While the card issuer retains some choice over
whether, for example, it will opt to include a generic or
individualized statement of the time and cost of repayment, it
nevertheless must include one of the statements described in the
statute. Because section 1748.13's disclosure requirements
mandate that specific information be included in cardholders'
billing statements, it directly conflicts with OTS regulation
560.2(b)(9).

Defendants and *amicus curiae* Consumers Union urge that the
express declaration of preemptive effect by the federal
regulators should be ignored. As such, the OTS declarations of
preemptive effect are not "substantive," but rather are self-
serving claims of federal authority in the form of "placeholder
regulations" which exceed the power of the OTS, and are therefore
void. The court concurs that, absent congressional grant, the
arrogation of preemptive authority by regulatory fiat is not
entitled to judicial deference. Here, however, the courts have
recognized the congressional grant of broad power to the OTS in
the area of regulatory control of federal savings and loan
associations. As stated above, the Supreme Court has recognized
that the OTS regulations govern "the powers and operations of
every Federal savings and loan association from its cradle to its
corporate grave." De la Cuesta, 458 U.S. at 145. The Ninth
Circuit has further recognized that OTS regulation of federal

21

savings associations is "so pervasive as to leave no room for state regulatory control." Stein, 604 F.2d at 1260; Bank of America, 309 F.3d at 558. In addition, in Bank of America, the Ninth Circuit found that OTS regulations occupy the field of operations as well as deposit and lending-related practices of federal savings banks:

> The Ordinances purport to regulate the operations, and the deposit and lending-related practices of federal savings banks. *However, OTS regulations occupy these fields.* See 12 C.F.R. § 545.2 (asserting field preemption of operations of federal associations); 12 C.F.R. § 557.11(b) (asserting field preemption of deposit-related practices of federal associations); 12 C.F.R. § 560.2(a) (asserting field preemption of lending-related practices of federal associations).

Bank of America, 309 F.3d at 560 (emphasis added). In light of the Ninth Circuit's holdings regarding section 560.2 as well as other similar OTS regulations, the court finds that such regulations do not exceed the scope of OTS's authority.[11]

Thus, section 1748.13 is in obvious conflict with OTS Regulation 560.2, which provides that state laws governing terms of credit and requiring specific disclosures in billing statements are preempted. Accordingly, the court holds that section 1748.13 in its entirety is preempted by HOLA and its accompanying OTS regulations which occupy the field of lending-

---

[11]    It is also noteworthy that a California Court of Appeal has recently found that the OTS did not exceed its authority in promulgating 12 C.F.R. section 560.2. See Wash. Mut. Bank v. Superior Court, 94 Cal. App. 4th 606, 616-19 (2002) (reciting history of adoption of section and stating that "[a]t the time Section 560.2 was issued, OTS advised that this 'general lending preemption provision,' was simply restating 'long-standing preemption principles applicable to federal savings associations, as reflected in earlier regulations, court cases, and numerous legal opinions issued by OTS and the Federal Home Loan Bank Board (FHLBB), OTS's predecessor agency.'" ).

1  related practices of federal savings associations.

2  **4.   National Bank Act**

3      The NBA was enacted to establish a national banking system

4  free from intrusive state regulation. See <u>Marquette Nat'l Bank v.</u>

5  <u>First of Omaha Serv. Corp.</u>, 439 U.S. 299, 314-15 (1978); <u>See Bank</u>

6  <u>of America</u>, 309 F.3d at 561. Case law reflects that "[t]he

7  supremacy of the federal government in regulating national banks

8  has long been recognized." <u>Bank of America</u>, 309 F.3d at 561

9  (citing cases).

10     The NBA bestows upon national banks the authority:

11         To exercise by its board of directors or duly
           authorized officers or agents, subject to law, all such
12         incidental powers as shall be necessary to carry on the
           business of banking; by discounting and negotiating
13         promissory notes, drafts, bills of exchange, and other
           evidences of debt; by receiving deposits . . . by
14         loaning money on personal security . . . .

15  12 U.S.C. § 24 (Seventh). National bank's incidental powers under

16  the NBA "include activities that are 'convenient or useful in

17  connection with the performance of one of the bank's established

18  activities pursuant to its express powers under the National Bank

19  Act.'" <u>Bank of America</u>, 309 F.3d at 562 (citing <u>M & M Leasing</u>

20  <u>Corp. v. Seattle First Nat'l Bank</u>, 563 F.2d 1377, 1382 (9th Cir.

21  1977), <u>cert. denied</u>, 436 U.S. 956 (1978)).

22      In furtherance of the NBA's goal of establishing a national

23  banking system:

24         [T]he Supreme Court has "interpret[ed] grants of both
           enumerated and incidental 'powers' to national banks as
25         grants of authority not normally limited by, but rather
           ordinarily preempting, contrary state law." <u>Barnett</u>
26         <u>Bank</u>, 517 U.S. at 32, 116 S.Ct. 1103 (citations
           omitted). Therefore, in determining the preemptive
27         scope of federal statutes and regulations granting a
           power to national banks, the Supreme Court has adopted
28         the view that "normally Congress would not want States

                                  23

to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." Id. at 33, 116 S.Ct. 1103.

Bank of America, 309 F.3d at 561.

Consistent with general principles of preemption, "[s]tate attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties." Id. (citing First Nat'l Bank v. California, 262 U.S. 366, 369 (1923)). Alternatively, "[s]tate regulation of banking is permissible when it 'does not prevent or significantly interfere with the national bank's exercise of its powers.'" Bank of America, 309 F.3d at 558-59 (quoting Barnett Bank, 517 U.S. at 33).

### A.   Office of the Comptroller of the Currency

As is the case with the OTS under the HOLA, the Office of the Comptroller of the Currency ("OCC") is responsible for administration of the NBA. See 12 U.S.C §§ 1, 26-27, 481. The Supreme Court has stated the following general principle regarding agency constructions of regulatory statutes:

> It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

NationsBank of North Carolina v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256-57 (1995) (internal citations and quotation marks omitted).

24

1    In Bank of America, the Ninth Circuit applied this principle
2  to the OCC's interpretation of national banks' incidental powers
3  under the NBA, finding that so long as the OCC's position is
4  reasonable, it is entitled to "great weight." 309 F.3d at 563.
5  The Bank of America court was presented with two interpretive
6  letters issued by the OCC addressing the statute at issue before
7  the court as well as its *amicus* brief. Id. It found the opinion
8  letters to be persuasive and consistent with the NBA and OCC
9  regulations, and thus concluded that they were at least "entitled
10 to respect." Id. Further, it found that the *amicus* brief was not
11 unworthy of deference. Id. In making that finding, the court
12 cited Auer v. Robbins, in which the Supreme Court found that an
13 *amicus* brief is not unworthy of deference so long as there is "no
14 reason to suspect that the interpretation does not reflect the
15 agency's fair and considered judgment on the matter in question."
16 519 U.S. 452, 462 (1997).

17    Here, as in Bank of America, the OCC proffered two opinion
18 letters and filed an *amicus* brief.[12]

19        **(1) *Amicus* Brief**

20    In its *amicus* brief the OCC sets forth in detail the
21 agency's position that the NBA preempts section 1748.13 in its
22 entirety. See Mem. *Amicus Curiae* of the Office of the Comptroller
23 of the Currency in Supp. of National Bank Pltfs.' Appl. for
24 Prelim. Inj. ("OCC *Amicus* Brief"), filed June 12, 2002; Suppl.
25 Mem. *Amicus Curiae* of the Office of the Comptroller of the

---

27  [12]    While the opinion letters do not specifically address
   the statute at issue in this case, plaintiffs cite them as
28  examples of far less onerous state laws than section 1748.13 that
   the OCC concluded were preempted. See Pltfs.' MSJ at 23.

1  Currency in Supp. of National Bank Pltfs.' Mots. for Inj. Relief
2  and Summ. J. ("Suppl. OCC *Amicus* Brief"), filed Sept. 20, 2002.
3  As an introductory matter, the OCC offers the following
4  interpretation of national banks' general powers under the NBA:

> A necessary aspect of [a national bank's] lending
> operations is the ability to communicate with customers
> about repayments and to monitor delinquencies. Bank
> management is accountable to the OCC, as well as to the
> marketplace, for ensuring the efficient bank operation
> that is fundamental to bank safety and soundness. Thus,
> the terms and conditions of extensions of credit, and
> the lender's management of credit accounts, are at the
> heart of the National Bank Act power to lend money.

OCC *Amicus* Brief at 9.

As to section 1748.13, the OCC interprets the statute as
presenting banks with the option of implementing one of four
alternative requirements:

(1) Charging no interest on the account balance in
order to take advantage of the exemption under section
1748.13(c)(2);

(2) Requiring a minimum payment of 10% of the account
balance in each billing cycle in order to take
advantage of the exemption under section 1748.13(c)(1);

(3) Providing (i) the basic warning, (ii) three generic
examples, and (iii) the phone bank capable of
dispensing custom payment estimates;[13] or

(4) Providing (i) the basic warning, (ii) three custom
estimates, and (iii) referrals to credit counseling
services.

---

[13]   This option would not be available for those
cardholders who make only the minimum payment for six consecutive
months. See Cal. Civ. Code § 1748.13(a)(2)(B).

26

1  See OCC *Amicus* Brief at 13.

2      The OCC concludes that the first option is preempted because
3  12 U.S.C. section 85 governs the interest rates national banks
4  may charge, and permits them to "charge interest with respect to
5  state law or the Federal Reserve discount rate plus 1 percent,
6  whichever is higher." Id. at 14. The OCC finds the second option
7  preempted because it "would encroach directly upon the national
8  bank power to determine the terms and conditions of offers of
9  credit."[14] Id. Further, the third option is preempted because the
10 required disclosures are both significant in length and intrude
11 on the highly valued space on the front page of the statement,
12 and additionally, the phone bank requirements are costly and
13 burdensome.[15] Id. at 15-18. Finally, the fourth option is
14 preempted because the customized estimates impose "significant
15 costs on national bank lending," and "provide consumers with
16 necessarily inaccurate projections." Id. at 18.

17     The court finds the OCC's interpretation of the preemptive
18 effect of the NBA on section 1748.13 to be reasonable. There is

19

20     [14]    The OCC further points to evidence submitted by
21 plaintiffs that one credit card issuer has provided notice to its
   cardholders that it will require a minimum 10% payment as of the
22 effective date of section 1748.13. See Dugan Decl., filed May 31,
   2002; see also Comstock Decl., filed May 31, 2002, at Ex. A.

23     [15]    The OCC additionally points to a conflict between an
24 OCC regulation and section 1748.13 that is not otherwise
   addressed by the parties, but merits mentioning here. 12 C.F.R.
25 section 7.3000 provides that "[a] national bank's board of
   directors should review its banking hours, and independently of
26 any other bank, take appropriate action to establish a schedule
   of banking hours." The OCC concludes that because federal law
27 grants national banks' boards of directors the power to determine
   banking hours, states are powerless to override those decisions.
28 Thus, this section presents a conflict with the phone bank's hour
   requirements.

1   no indication in the OCC's *amicus* brief that its opinion as

2   contained therein "does not reflect the agency's fair and

3   considered judgment on the matter in question." <u>Auer v. Robbins</u>,

4   519 U.S. 452, 462 (1997). The brief compares federal law with the

5   requirements of section 1748.13, and comes to reasonable

6   conclusions on questions of preemption. Thus, under <u>Bank of</u>

7   <u>America</u>, the OCC's reasonable position regarding preemption

8   issues in its *amicus* brief is entitled to "great weight" in the

9   NBA analysis.

10              **(2) Opinion Letter**

11       The OCC cites an opinion letter which addressed a West

12   Virginia law governing the sale of insurance (the "West Virginia

13   opinion letter"). Preemption Opinion, 66 Fed. Reg. 51,502 (Oct.

14   9, 2001).[16] The OCC found that some of the law's requirements

15   were preempted by the Gramm-Leach-Bliley Act ("GLBA").[17] For

16   example, the OCC found that certain disclosures which were

17   subject to "manner and timing" requirements were preempted

18   because they would "increase a bank's operating costs and

19

20   [16]   A second opinion letter cited by plaintiffs addresses
21   an Ohio law requiring that banks resell leased vehicles only
     through licensed used car dealers. Preemption Opinion, 66 Fed.
22   Reg. 23,977 (May 10, 2001). The OCC found that the law was
     preempted in part because it "frustrate[d] [national banks']
23   ability to operate their leasing businesses in an economically
     efficient manner." <u>Id.</u> at 23,979. This opinion letter is only
24   minimally helpful to the court insofar as it establishes the
     OCC's view that national banks have the power to operate
25   according to their own opinions on economic efficiencies.

26   [17]   The GLBA contains a preemption provision imposing the
     standard generally applicable to any federal preemption analysis:
27   state laws which prevent or significantly interfere with a bank's
     ability to engage in any activity in which the bank is permitted
28   to engage under federal law (in the West Virginia case, the GLBA)
     are preempted. <u>See</u> <u>Barnett Bank</u>, 517 U.S. at 33.

                              28

substantively hamper the bank's marketing activities." Id. at 51,507-08. It also found that requiring oral disclosures "places additional burdens on banks to train personnel and to develop procedures to ensure compliance with this requirement." Id. at 51,508. Further, it found the costs of compliance to be "especially troublesome for small banks," which "need to keep costs down to offer a full array of products and services in the communities they serve." Id.

However, the OCC also found that certain provisions of the law were not preempted. For example, the OCC addressed one section that required transactions involving the extension of credit and insurance sales to be completed independently and through separate documents when insurance is required as a condition of the loan. Id. at 51,507. The OCC concluded that this requirement, which imposed "an additional paperwork burden and associated administrative costs on banks," "would not appear to substantially affect the underlying insurance activities." Id.

The OCC's reasoning in the West Virginia opinion letter is applicable to a number of the requirements set out in section 1748.13. For example, section 1748.13's disclosure requirements will take up numerous lines of space on cardholders' billing statements, which may result in additional paper and postage costs. More importantly, costs associated with operation of the phone banks required under the statute are estimated to be approximately $684,642.50 per month. Staten Decl. No. 4 at ¶ 5. Undoubtedly, this constitutes a significant burden that would require additional costs in the form of training personnel, staffing the phone banks, and developing compliance procedures.

1  Finally, plaintiffs have submitted the declarations of numerous
2  smaller federally chartered lenders expressing concerns over the
3  burdens associated with compliance with the statute. Some of
4  these lenders have even represented their intentions to exit the
5  California credit card market due to the burdensome nature of
6  compliance. OCC argues that many of these "burdens" imposed on
7  plaintiffs by section 1748.13 are in some respects similar to
8  those the OCC found sufficient to warrant preemption in its West
9  Virginia opinion letter.

10      However, the letter also reveals that the OCC found portions
11  of the West Virginia law were insufficiently burdensome to
12  warrant preemption. During oral argument the OCC acknowledged
13  that a portion of section 1748.13, if severed, may be similarly
14  characterized and thus viewed as "de minimus." Thus, the OCC's
15  opinion letter offers some guidance to the court in assessing the
16  preemptive reach of the OCC's regulations in this case.

17      **B.   NBA Analysis**

18      Defendants argue that the NBA analysis should begin with a
19  presumption against preemption in this case. See Defs.' Opp'n to
20  PI at 10. More specifically, defendants argue that because
21  section 1748.13 is a consumer protection law, and consumer
22  protection is an area of legislation the states have
23  traditionally occupied, the statute is entitled to a presumption
24  against preemption. Id. However, Bank of America requires a
25  contrary result. Bank of America makes clear that while states
26  are not without any authority to impose regulations upon national
27  banks, the areas in which they are permitted to regulate are
28  typically limited to "contracts, debt collection, acquisition and

transfer of property, and taxation, zoning, criminal, and tort law." 309 F.3d at 559 (citing cases). Consumer protection is not reflected in the case law as an area in which the states have traditionally been permitted to regulate national banks. Accordingly, under Bank of America, "because there has been a 'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable." Id.

Further, national banks' authority is not normally limited by, but rather ordinarily preempts contrary state law. Barnett Bank, 517 U.S. at 32, 34 ("[W]here Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies."). The express power of the NBA at issue here is that of "loaning money on personal security." 12 U.S.C. § 24 (Seventh). There is no indication in the NBA that Congress intended to subject that power to local restriction. See Barnett Bank, 517 U.S. at 34-35. Therefore, the court proceeds with the understanding that the ordinary rule is one of preemption of contrary state law.

In order to survive preemption, section 1748.13 must not prevent or significantly interfere with national banks' powers under the NBA. See Barnett Bank, 517 U.S. at 33. National banks' powers include those that are incidental, or those that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act." M & M Leasing Corp., 563 F.2d at 1382. Plaintiffs maintain that section 1748.13 interferes

with the federal power to lend money through its imposition of costly operational and administrative burdens on national banks' lending activities. Pltfs.' MSJ at 15. Plaintiffs have submitted evidence that compliance with section 1748.13 will impose significant monetary and non-monetary costs on national banking institutions. Those costs may be roughly categorized as follows:

(1) Paper and postage costs. See Christie Decl., filed May 31, 2002, at ¶ 17; Fimby-Dukart Decl., filed May 31, 2002, at ¶ 10; Morrison Decl., filed May 31, 2002, at ¶ 8; Stork Decl., filed May 31, 2002, at ¶ 11; Staten Decl. No. 4 at ¶ 5.

(2) Reduced profits (through increased delinquencies) due to displacement of front-page billing information. See Fimby-Dukart Decl. at ¶ 6; Hill Decl. at ¶ 12; Stork Decl. at ¶ 10.

(3) Reduced profits due to emphasis on potential negative effects of borrowing.

(4) Provision of misinformation to consumers. See Ward Decl. at ¶¶ 9-11.[18]

(5) Staffing of phone banks. See Staten Decl. No. 4 at ¶ 5.

(6) Exit from California credit card market by smaller banking institutions. See Hamby Decl. at ¶¶ 5-7; Youngs Decl. at ¶¶ 7-8.

---

[18]    Plaintiffs conducted a consumer survey in which they discovered that over 50% of 843 randomly selected cardholders incorrectly understood the Minimum Payment Warning to mean that paying only the minimum would increase the interest *rate* on their credit cards. See Ward Decl. at ¶ 9-11.

(7) Coercion to impose 10% minimum monthly payment. <u>See</u> Dugan Decl. at ¶¶ 5, 7, Ex. A; Comstock Decl. at Ex. A.

(8) Software and hardware establishment and maintenance costs. <u>See</u> Staten Decl. No. 4 at ¶ 5.

(9) Interference with banks' business experience regarding counseling procedures. <u>See</u> Hill Decl. at ¶ 9; Kietz Decl. No. 1 at ¶ 20; Weber Decl. No. 1 at ¶ 19.

There is, however, no authority that provides a yardstick for measuring when a state law "significantly interferes with," "impairs the efficiency of," "encroaches on," or "hampers" the exercise of national banks' powers. <u>See</u> <u>Barnett Bank</u>, 517 U.S. at 33-34. However, the threshold of preemption is in some cases remarkably low. For example, in <u>Franklin National Bank v. New York</u>, the Supreme Court found that a state statute prohibiting national banks from using the word "saving" or "savings" in advertising their business was preempted by the NBA. 347 U.S. 373, 377-79 (1954). The state law imposed no affirmative requirements on national banks, unlike section 1748.13. Nor were there any costs associated with compliance with the law, again, unlike section 1748.13. Rather, national banks were simply required to abstain from using two words in the advertising context. Nevertheless, the Court found the state law preempted, and concluded that "[h]owever wise or needful New York's policy . . . it must give way to the contrary federal policy." <u>Id.</u> at 379. Similarly, the court may not consider the State's needfulness of section 1748.13 here, no matter how compelling it finds the State's reasons for enactment of the statute.

The Supreme Court, however, has also found that other

33

1 burdens are insufficient to warrant preemption. For example, in
2 Lewis v. Fidelity & Deposit Co. of Maryland, the state statute at
3 issue was one that required enforcement of a lien under state
4 law. 292 U.S. 559 (1934). The bank argued that due to this law,
5 it would be unable to sell property it was entitled to because no
6 one would purchase property subject to a lien. Id. at 567. The
7 Court recognized that "a national bank is subject to state law
8 unless that law interferes with the purposes of its creation, or
9 destroys its efficiency, or is in conflict with some paramount
10 federal law." Id. at 566. Nevertheless, the Court concluded that
11 the state law was not preempted. Id. at 567-68.

12     The above cases and others[19] illustrate that there is no
13 single cognizable standard by which state laws are subject to
14 preemption. As a result, understandably, the court should look to
15 the OCC's interpretation of the NBA which, if reasonable, is
16 entitled to "great weight." Here, the OCC states that terms and
17 conditions of extensions of credit as well as management of
18 credit accounts are powers "at the heart of" the NBA authority to
19 lend money. In assessing the various options for compliance with
20 section 1748.13, the OCC found that the burdens imposed under
21 each option, both monetary and non-monetary, are "substantial."
22 In light of the evidence and controlling precedential authority,
23 the OCC's opinion is a reasonable one, and thus the monetary and
24 non-monetary costs identified by plaintiffs constitute a

25

26     [19]   The Supreme Court's opinion in Barnett Bank contains a
27 thorough survey of cases finding preemption of state laws by the
   NBA, as well as those cases finding no preemption of state law by
28 the NBA. See Barnett Bank, 517 U.S. at 32-34.

1 significant interference with national banks' powers under the

2 NBA.

**5.     Federal Credit Union Act**

4       The FCUA was enacted to regulate federal credit union

5 activities. The National Credit Union Association ("NCUA") is

6 granted exclusive authority under the FCUA to "regulate the

7 rates, terms of repayment and other conditions of Federal credit

8 union loans and lines of credit (including credit cards) to

9 members." 12 C.F.R. § 701.21(b). The NCUA's regulatory authority

10 "preempts any state law purporting to limit or affect" rates of

11 interest and terms of repayment, including the amount,

12 uniformity, and frequency of payments. Id.

13      However, 12 C.F.R. section 701.21(b)(3) also expressly

14 limits the preemptive effect of NCUA regulations:

> Except as provided by paragraph (b)(1) of this section,
> it is not the Board's intent to preempt state laws
> affecting aspects of credit transactions that are
> primarily regulated by Federal law other than the
> Federal Credit Union Act, for example, *state laws
> concerning credit cost disclosure requirements* . . . .

19 12 C.F.R. § 701.21(b)(3) (emphasis added).[20]

20      The NCUA has issued an opinion letter concluding that

21 section 1748.13 is preempted by its lending regulation. See App.

22 of Miscellaneous Authorities in Supp. of Pltfs.' Mot. for Summ.

23 J. and Perm. Inj. Relief and Pltfs.' Appl. For Prelim. Inj.

24 ("Pltfs.' App."), filed Sept. 20, 2002, at Ex. E. In that opinion

---

26      [20]   The NCUA has further directed that in cases where other
federal laws, such as the federal Truth in Lending Act ("TILA"),
27 establish their own standards for determining preemption of state
laws, federal credit unions "should generally look to those
28 standards in determining preemption issues." 49 Fed. Reg. 30,683,
30,684 (NCUA Aug. 1, 1984).

letter, the NCUA states:

> The California law at issue *affects the terms of*
> *repayment by placing additional burdens* on credit card
> issuers that do not require minimum monthly payments of
> at least ten percent. NCUA's longstanding position is
> that state laws affecting terms of repayment are
> preempted. 49 Fed. Reg. 30683, 30684 (August 1, 1984).

Pltfs.' App. at Ex. E (emphasis added).

The NCUA asserts that the 10% repayment option "affects the terms of repayment," since federal credit unions must either impose a 10% minimum monthly repayment or be subjected to the onerous requirements of the statute.[21] The NCUA regulations establish that the agency does not intend to preempt state laws concerning credit cost disclosure requirements. 12 C.F.R. § 701.21(b)(3). However, section 1748.13 does not simply impose credit cost disclosure requirements, but rather uses credit disclosures and other requirements (e.g. phone banks) as sanctions to coerce lenders into imposing a 10% minimum payment. Thus "disclosures" under section 1748.13 would seem to fall outside the purview of 12 C.F.R. section 701.21(b)(3). Accordingly, the requirements imposed by section 1748.13 appear to conflict with the NCUA's broad power to regulate the rates, terms of repayment, and other conditions of federal credit union loans and lines of credit.

## 6. Severability

The issue of severability presents the remaining question, namely, is there a portion of the statute which properly escapes

---

[21] Presumably, the NCUA's opinion would also be applicable to section 1748.13(c)(2), which permits credit card issuers to escape the requirements of the statute in billing cycles where they do not impose finance charges. Cal. Civ. Code § 1748.13(c)(2).

1  the preemptive reach of the NBA or the FCUA that can be enforced

2  by the State of California?

3      **A.    NBA**

4      When assessing the NBA's preemptive effect on section

5  1748.13 in its *amicus* brief, the OCC did not look at each

6  provision of the statute individually. Rather, it based its

7  analysis upon what it saw to be the four "options" available to

8  national banks under the statute. During oral argument, when

9  questioned about a possible severable provision of the statute

10 such as the generic Minimum Payment Warning, the OCC responded

11 that the agency "could not commit itself to an answer" on the

12 question. Reporter's Transcript of Proceedings ("RT"), Dec. 6,

13 2002, at 47-49. However, the OCC represented that it considers

14 such a disclosure "salutary," one that imparts information people

15 "should know." RT at 48. The OCC additionally noted that there

16 have been instances where the agency found that a state law that

17 imposed a burden on national banks was not preempted when the

18 burden is *de minimus*, such as discussed in the West Virginia

19 opinion letter above. RT at 49-50; see Preemption Opinion, 66

20 Fed. Reg. at 51,507.

21     Because the OCC has not issued an opinion letter

22 specifically discussing section 1748.13, and because the OCC's

23 *amicus* brief does not address the preemptive effect of each

24 individual provision of section 1748.13, the court is without a

25 "formal" agency position on the matter. However, taking the West

26 Virginia opinion letter and the OCC's comments during oral

27 argument as a guide, there appears a distinct likelihood the OCC

28 would find that a generic Minimum Payment Warning, if severable,

1  is insufficiently burdensome to warrant preemption.

2  The Minimum Payment Warning alone would take up only one or
3  two lines of text on the first page of credit cardholders'
4  billing statements. Absent the other disclosure requirements
5  mandated by section 1748.13, this simple warning is unlikely to
6  result in the addition of a page to monthly billing statements.
7  Thus, additional paper, printing, and postage costs will be
8  minimal if not non-existent.[22] Other monetary costs include
9  establishing a system to identify the bills of only California
10 cardholders. Because credit card issuers already have systems in
11 place to distinguish between different cardholders, this cost
12 should also be minimal. Finally, there is insufficient evidence
13 that other important billing information would be displaced, thus
14 resulting in increased delinquencies. In short, if credit card
15 issuers were required to include only the Minimum Payment Warning
16 on billing statements, the burdens imposed would be
17 insignificant.

18 **B.   FCUA**

19 A similar analysis regarding the Minimum Payment Warning is
20 applicable to the FCUA. While the NCUA correctly notes in its
21 opinion letter that section 1748.13's statutory scheme imposes
22 significant "additional burdens," the "burden" imposed by the

23

24 [22]   The illustrative examples required under section
25 1748.13(a)(2), while perhaps informative to cardholders,
   nevertheless impose substantial costs on card issuers. Because
26 these statements would take up numerous lines of space on billing
   statements, plaintiffs' concerns regarding additional paper,
27 printing, and postage costs if these requirements were to be
   imposed are convincing. Therefore, the court is persuaded that
28 these disclosure requirements impose significant burdens on
   federally chartered credit card issuers.

Minimum Payment Warning is unrelated to the "burdens" of repayment, since it is a "credit cost disclosure" expressly *not* preempted by the NCUA's own regulations. See 12 C.F.R. § 701.21(b)(3). In the absence of the other requirements of section 1748.13, the Minimum Payment Warning would simply be a "credit cost disclosure requirement," which the NCUA has declared it has no intention to preempt. In addition, a severable Minimum Payment Warning may well be *de minimus* and "salutary," as noted by the OCC.

### C.   Enforcement of Section 1748.13

The court has found that HOLA and OTS holistically preempt section 1748.13 in its entirety. The court further finds that the NBA and OCC, and the FCUA and NCUA, preempt the statute with the possible exception of the Minimum Payment Warning. Thus the question presented is whether the Minimum Payment Warning may be severed so that it is enforceable against national banks and federal credit unions but unenforceable against federally chartered savings and loans.

The court must apply California law when addressing severability of a statute. See Leavitt v. Jane L., 518 U.S. 137, 139 (1996). The severability determination requires an assessment of whether the invalid parts of the statute can be severed from the otherwise valid parts without destroying the validity or utility of the remaining provisions. See Raven v. Deukmejian, 52 Cal. 3d 336, 355-56 (1990). More specifically, the invalid provisions must be severable (1) grammatically; (2) functionally; and (3) volitionally. Gerken v. Fair Political Practices Com., 6 Cal. 4th 707, 714 (1993).

1    A provision is grammatically severable where the "valid and
2    invalid parts can be separated by paragraph, sentence, clause,
3    phrase or even single words." Santa Barbara Sch. Dist. v.
4    Superior Court, 13 Cal. 3d 315, 330 (1975). A provision is
5    functionally severable "if the remaining provisions can stand on
6    their own, are capable of separate enforcement, can be given
7    effect, or can operate . . . independently of the invalid
8    provisions." League of United Latin American Citizens v. Wilson,
9    908 F. Supp. 755, 766 (C.D. Cal. 1995) (internal citations and
10   quotation marks omitted). Finally, a provision is volitionally
11   severable where the remainder of the statute "would have been
12   adopted by the legislative body had the latter foreseen the
13   partial invalidity of the statute." Katz v. Children's Hospital
14   of Orange County, 28 F.3d 1520, 1531 (9th Cir. 1994).

15       In this instance, section 1748.13 can be grammatically
16   severed to leave standing only subsection (a)(1), the Minimum
17   Payment Warning. The remainder of the statute can be stricken
18   without confusion or uncertainty. The court further finds the
19   statute is functionally severable. Specifically, the Minimum
20   Payment Warning stands on its own and can be separately enforced
21   against federally chartered banks and credit unions, independent
22   of the statute's invalid portions. However, despite the
23   grammatical and functional severability of the Minimum Payment
24   Warning, the court must also find volitional severability.

25       Volitional severability is the most important of the three
26   and requires a determination of legislative intent. Here, the
27   legislative record, unfortunately, does not provide a well-lit
28   path to follow.  First, the court notes that the statute contains

no severability clause, and thus the legislature's intent to save the statute in part if certain provisions were held invalid is not apparent. See In re Reyes, 910 F.2d 611, 613 (9th Cir. 1990) (noting that absence of severability clause suggests an "intent to have all components 'operate together or not at all'"). This is particularly troublesome in light of extensive authority warning states that federally chartered lenders enjoy broad congressional grants of authority. See Bank of America, 309 F.3d at 558-59.

Second, the record includes no public discussion of federal preemption issues.  Thus, if only a portion of the statute is applicable to only certain federally chartered credit card issuers, section 1748.13 could not be severed "without rendering the end product a Swiss cheese regulation that would not be capable of 'accomplishing [the statute's] legislative purposes'" as to a substantial number of federally chartered lenders.  City of Auburn v. Qwest Corp., 260 F.3d 1160, 1181 (9th Cir. 2001).

Finally, a finding of severability only as to federally chartered banks and credit unions is judicially inappropriate. Section 1748.13 refers generally to "credit card issuer[s]" and makes no distinction between different types or categories of issuers. However, if the statute is partially preempted only as to certain federally chartered lenders, the court would have to effectively "rewrite" the statute. This the court cannot do. See Metromedia, Inc. v. City of San Diego, 32 Cal. 3d 180, 187 (1982) (quoting Blair v. Pitchess, 5 Cal. 3d 258 (1971)) ("This court cannot . . . in the exercise of its power to interpret, rewrite the statute. If this court were to insert in the statute all or

41

1  any of the . . . qualifying provisions [required to render it

2  constitutional], it would in no sense be interpreting the statute

3  as written, but would be rewriting the statute in accord with the

4  presumed legislative intent. That is a legislative and not a

5  judicial function."). For example, if the court were to sever the

6  balance of the statute to apply the basic warning only to certain

7  lenders, such severability may impose a competitive advantage of

8  one federally chartered lender over another. The result of such

9  mechanical severability would be an intrusion upon the

10  legislative and executive branches of government, both federal

11  and state.

12      Thus, the court finds that the statute may not be severed to

13  require application of subsection (a)(1) to only national banks

14  and federal credit unions. Accordingly, the court finds the

15  statute is constitutionally inapplicable in its entirety to all

16  federally chartered credit card issuers.

17  **7.   Scope of Injunctive Relief**

18      Defendants maintain that the permanent injunction the court

19  issues should only benefit the named plaintiffs in this action.

20  However, because the court finds that the statute is inapplicable

21  to all federally chartered credit card issuers, this holding by

22  its very nature affects the rights of parties beyond the named

23  plaintiffs in this action. This result is consistent with other

24  cases addressing federal preemption of state or local laws, such

25  as Bank of America, where the court issued an injunction

26  preventing enforcement of the ordinance at issue without

27  reference to the parties to whom the injunction applied. 309 F.3d

28  at 556. In addition, the Ninth Circuit has recognized that "an

1  injunction is not necessarily made over-broad by extending
2  benefit or protection to persons other than prevailing parties in
3  the lawsuit." <u>Bregsal v. Brock</u>, 843 F.2d 1163, 1170 (9th Cir.
4  1987). Finally, the practical result of an injunction limited to
5  plaintiffs would be to require federal lenders not a party to
6  this action to bring individual actions for injunctive relief.
7  This would not only result in a waste of judicial resources, but
8  is unnecessary in light of the cases permitting general
9  injunctions in the preemption context.

<b>CONCLUSION</b>

11      For the foregoing reasons, the court holds that the HOLA and
12  OTS regulations preempt section 1748.13 in its entirety. The
13  court further holds that the NBA and OCC regulations and the FCUA
14  and NCUA regulations preempt all sections of 1748.13 except
15  subsection (a)(1). Since the court finds that subsection (a)(1)
16  may not be severed to require application of subsection (a)(1) to
17  only national banks and federal credit unions, it holds that
18  section 1748.13 in its entirety is inapplicable to all federally
19  chartered banks and credit unions.

20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

Accordingly, plaintiffs' motion for summary judgment and for a permanent injunction is GRANTED.[23] A permanent injunction shall issue prohibiting defendants from enforcing the statute against all federally chartered credit card issuers.

IT IS SO ORDERED.

DATED: December 23, 2002

_____
FRANK C. DAMRELL, Jr.
UNITED STATES DISTRICT JUDGE

---

[23]    Because the court grants plaintiffs' motion for summary judgment and for a permanent injunction, plaintiffs' motion for a preliminary injunction is DENIED as moot.

44

United States District Court
for the
Eastern District of California
December 23, 2002


* * CERTIFICATE OF SERVICE * *


2:02-cv-01138


American Bankers

    v.

Lockyer

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  December 23, 2002, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.


    John Joseph Quinn Jr                MP/FCD
    Arnold and Porter
    777 South Figueroa Street          CF/JFM
    44th Floor
    Los Angeles, CA  90017-2513

    Dennis G Lyons
    PRO HAC VICE
    Arnold and Porter
    555 Twelfth Street Northwest
    Washington, DC  20004

    Michele J Woods
    PRO HAC VICE
    Arnold and Porter
    555 Twelfth Street Northwest
    Washington, DC  20004

    Christine E Koh
    PRO HAC VICE
    Arnold and Porter
    555 Twelfth Street Northwest
    Washington, DC  20004

    Howard N Cayne
    PRO HAC VICE

Arnold and Porter
Washington, DC  20004

Susan Eileen Henrichsen
Attorney General of the State of California
PO Box 85266
110 West A Street
Suite 1100
San Diego, CA  92186-5266

Robyn Cerny Smith
Attorney General's Office of the State of California
Department of Justice
300 South Spring Street
Fifth Floor
Los Angeles, CA  90013-1204

Douglas B Jordan
NOT EDCA ADMITTED
Office of the Comptroller of the Currency
250 E Street SW
Washington, DC  20219

Jeffrey Allen Rich
Attorney General's Office for the State of California
PO Box 944255
1300 I Street
Suite 125
Sacramento, CA  94244-2550

Deanne Beth Loonin
National Consumer Law Center
77 Summer Street
Tenth Floor
Boston, MA  02110


                              Jack L. Wagner, Clerk

                    BY:  _____
                              Deputy Clerk